# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NATE A. LINDELL,
        **Plaintiff,**

    **v.**                         **Case No. 19-C-255**

WILLIAM POLLARD,
STEVE SCHUELER,
JOHN KIND,
JAY VAN LANEN,
DREW WEYCKER,
KYLE PEOTTER,
JOSHUA GOMM,
JESSE AULT,
MICHAEL NEVEU, and
ALEX BONIS,
        **Defendants.**

---

## <u>DECISION AND ORDER</u>

Plaintiff Nate A. Lindell, a state prisoner who is representing himself, brings claims under 42 U.S.C. § 1983 relating to a strip search and his subsequent placement in an allegedly feces-contaminated cell. Before me now are the parties' cross motions for summary judgment.

## I. BACKGROUND

On October 9, 2018, the plaintiff transferred from the Wisconsin Secure Program Facility to the Green Bay Correctional Institution, where he was housed in the Restrictive Housing Unit ("RHU"), also known as solitary confinement. Captain Jay Van Lanen supervised the RHU when the plaintiff arrived there. The day the plaintiff arrived, Captain Daniel Cushing (who not a defendant) emailed Green Bay's security supervisors regarding his transfer there, stating:

This inmate is big into filing litigation. This inmate also writes Between the Bars and they post his writing to a blog on the internet. Anything you say to him or that he is witness to will end up on the internet. Just an FYI.

Pl. Proposed Findings of Fact ("PFOF"), ECF No. 148 ¶ 2.

The plaintiff authored articles about abuses and suicides in Green Bay's RHU. On November 14, 2018, a Green Bay crisis-intervention worker emailed Captain Van Lanen about a recent internet post from the plaintiff that included a drawing of the inside of a cell, mentioned Van Lanen by name, and referenced an inmate suicide as well as the "daily happenings of inmates in seg." Pl. PFOF ¶ 7.

On several occasions prior to November 29, 2018, Lindell wrote to the institution's psychologist, Todd Hamilton, and told him that staff members were mistreating a suicidal prisoner, Travant Schmidt, who was housed in the cell next to Lindell's. Pl. PFOF ¶ 15. Lindell also noted how other prisoners in the RHU were exhibiting symptoms that he believed were symptoms of mental illness caused by segregated confinement. *Id.*

On November 29, 2018, Captain Van Lanen had a conversation with Hamilton. The parties dispute the content of the conversation. According to the plaintiff, he and another prisoner heard Hamilton tell Van Lanen about the plaintiff's correspondence to Hamilton, and Van Lanen replied, "We need to get Lindell away from Schmidt." Pl. PFOF ¶¶ 15-16. According to the defendants, Van Lanen's conversation was about why Schmidt was on observation status and what could be done to remove him from observation status and did not include any mention of needing to move Schmidt away from the plaintiff. Def. Resp. to Pl. PFOF ¶ 16.

## A. Strip Search

On November 30, 2018, the plaintiff was removed from his cell and taken to see a psychiatrist. While the plaintiff was away, one or more staff members of the RHU conducted a random search of his cell. The parties do not identify the staff member or members who performed the search, but the plaintiff does not contend that any of the defendants performed the search.[1] After the search, defendant Van Lanen was notified that screws were missing from the plaintiff's cell and that contraband consisting of "hoarded food and broken containers, pen inserts, and excessive linens" had been found. Van Lanen Decl. ¶ 11. Based on this information, Van Lanen ordered Lindell to be strip searched and moved to a different cell. *Id*. ¶ 12. Van Lanen states that he gave this order "because it was suspected that screws were missing from [the plaintiff's] cell, he was misusing linens, and may have possession of other contraband." *Id*. The plaintiff denies that he had any contraband in his cell at the time of the search. Lindell Decl. ¶ 28, ECF No. 50.

Defendant Joshua Gomm is the correctional officer who performed the strip search. According to the plaintiff, Gomm approached him after his psychiatric appointment and told him that Van Lanen had ordered a strip search because screws were missing from "other cells on [the plaintiff's] wing." Lindell Decl. ¶ 17, ECF No. 150. To perform the strip search, Gomm placed the plaintiff in a cell and had him remove his clothes. Gomm observed the plaintiff from outside the cell, and another correctional

---

[1] Some documents in the record indicate that the search was performed by Officer Maher, who is not a defendant. *See* Defs.' PFOF ¶ 5; PREA Interview Report (ECF No. 115-4 at 12).

3

officer, Officer Ault, recorded Gomm with his body camera. (Ault did not record the plaintiff while he was naked to protect his privacy.) A third officer, defendant Drew Weycker, was also present during the search, and Van Lanen was nearby.

Ault's body-camera footage shows a search that lasted about fifty seconds. ECF No. 108-1, Ex. 1010. The video shows the plaintiff passing his clothes and shoes to Gomm, and Gomm is heard asking the plaintiff for his glasses. During the video, Gomm instructs the plaintiff to remove his clothes and expose areas of his body. Gomm tells the plaintiff to open his mouth and show under his tongue, Gomm says "armpit," then says "genitals," "turn around," and "thank you Lindell." Gomm then walks away from the cell and Ault turns off his camera. Gomm is not shown touching Lindell or making inappropriate comments.

According to the plaintiff, Gomm did more than what is shown in the footage from the body camera. The plaintiff says that, after the initial strip search, Weycker instructed Ault to turn off his body camera. Lindell Decl. ¶ 19. At that point, Gomm began "smiling insultingly" at the plaintiff while he was naked and told him that he would give him his clothes back only if he "stuck [his] finger in his butt and then showed it to [Gomm], then put it in [his] mouth." *Id.* According to the plaintiff, Gomm told him he would have to move his finger around in his mouth and said, "You like a shitty mouth, don't you?" *Id.* The plaintiff does not claim that he complied with these instructions, but he says he was shocked and offended by Gomm's comments. *Id.* He claims that, after Gomm made the comments, either Weycker or Ault "chuckled." *Id.* The plaintiff also claims that Gomm told him to "bust it open," which is slang for commanding a person to open their legs and expose their genitals. Pl. PFOF ¶ 23. Gomm denies making the comments, Gomm Supp.

4

Decl. ¶ 3, and Weycker denies telling Ault to turn his camera off, Weycker Supp. Decl. ¶ 4. Van Lanen states that he observed the search and did not witness any inappropriate behavior by Gomm. Van Lanen Decl. ¶ 20.

The plaintiff contends that Gomm refused to return the plaintiff's clothing after the search. Gomm admits that he did not immediately return the plaintiff's clothing, but he contends that this was because he was unsure whether the plaintiff would be placed on a linen restriction. Gomm Supp. Decl. ¶ 4. Eventually, Van Lanen determined that the plaintiff would not be placed on a linen restriction and directed staff members to return the plaintiff's clothing. Supp. Van Lanen Decl. ¶ 8. Van Lanen does not recall how long the plaintiff was without his clothing, but he estimates it was 20–30 minutes. *Id.* ¶ 9. Van Lanen states that the plaintiff was offered a smock to wear before his clothing was returned, which he declined. *Id.* The plaintiff contends that he was without clothing for around an hour. Lindell Decl. ¶ 30.

It is undisputed that the strip search of the plaintiff did not uncover contraband. However, because the earlier search of the plaintiff's cell revealed hoarded food and broken containers, the plaintiff was placed on a property restriction and a restriction to bag meals from November 30, 2018 to December 9, 2018. *See* Weycker Decl. ¶ 5 & Exs. 1013 & 1014. Under the property restriction, the plaintiff was not allowed to possess property in a container, such as toothpaste, milk, shampoo, or deodorant. Weycker Decl. ¶ 6.

The plaintiff filed an inmate complaint about the strip search, which the institution labelled GBCI-2018-25475. *See* Exhibit 1012. The plaintiff described the issue he was

complaining about as "C.O. Gomm strip searched me in sexually degrading and unnecessarily [sic]." *Id.* at 11. He provided the following details:

> On 30 Nov., per Van Lanen's orders, I was moved to 220. At that time, after [another officer] saw me, Gomm [and another officer] told me that I was being strip searched b/c screws were missing from my wing. Gomm made me perform sexual acts, expose my genitals, anus and oral cavity. Then he told me I was going on clothing/linen restriction, that the strip was a ruse to get my clothes off.
>
> If they were genuinely concerned about missing screws, they'd search the whole wing, not just me—no screws were missing from my cell.

*Id.* Because the plaintiff's complaint alleged sexual abuse, the institution processed it under its procedures for complying with the Prison Rape Elimination Act. Van Lanen was assigned to investigate the complaint. *See* Exhibit 1011 at 10. He interviewed Gomm, who denied any wrongdoing. *Id.* at 12–13. The plaintiff refused to be interviewed. *Id.* at 5. Based on this information, Van Lanen concluded that the complaint was unfounded. *Id.* at 1, 8.

In this suit, the plaintiff alleges that the strip search violated his constitutional rights in several ways. First, he contends that Van Lanen ordered the strip search to retaliate against him for engaging in activity he believes was protected by the First Amendment, such as writing internet posts about prison conditions and helping fellow inmates file complaints and intra-prison requests. Second, and perhaps relatedly, the plaintiff contends that the strip search was not justified by legitimate penological purposes but instead was performed unnecessarily, in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment. Finally, the plaintiff alleges that the manner of the search violated the Eight Amendment, in that Gomm performed it in a degrading and humiliating manner.

6

## B.    Dirty Cell

After the strip search was completed, Van Lanen ordered Weycker to assign the plaintiff to a new cell on the "200 wing" of the RHU. *See* Van Lanen Decl. ¶ 13; Weycker Decl. ¶ 8. Weycker states that he randomly picked an open and clean cell on the 200 wing—cell 220—and assigned it to the plaintiff. Weycker Decl. ¶ 8. Weycker states that he did not personally inspect the cell before transferring the plaintiff to it, and that he had no reason to think it was dirty. *Id.* ¶ 9. The plaintiff contends that, after the strip search, Gomm told him that Van Lanen had directed Gomm to put the plaintiff in cell 220. Lindell Decl. ¶ 31.[2] Van Lanen states that the sergeant (presumably Weycker) randomly selected cell 220. Van Lanen Decl. ¶ 13. Van Lanen states that he did not inspect cell 220 before the plaintiff was placed in it and that he had no reason to think it was dirty. *Id.* ¶ 15.

Officer Ault brought Lindell from the cell in which he was strip searched to cell 220. Ault Decl. ¶ 10. After the plaintiff was placed in the cell, he observed what he believed to be human feces smeared on the inside of the cell door and around the edge of the door's window. Ault, however, did not notice anything on the door when he placed the plaintiff in the cell, and he does not recall the plaintiff complaining about the condition of his cell at that time. *Id.* ¶ 11.

Body-camera footage from Officer Maher shows the condition of the cell immediately prior to the plaintiff's arrival. *See* DVD recording entitled "Maher placing property into cell 220." In the video, Maher makes several trips into the cell to place the

---

[2] Lindell's declaration states that Gomm told him that Van Lanen had told Gomm to put the plaintiff in "cell 222" rather than 220, but I assume that the reference to cell 222 is a typographical error.

plaintiff's property inside. The floor and all the walls of the cell appear clean, but the camera does not focus on the inside of the cell's doorway. A short time after the plaintiff is placed in the cell, Maher walks past the plaintiff's cell, and the plaintiff tells him that he needs some cleaning supplies because he can "smell shit." *Id.* at 5:44. Maher (who is not a defendant) says "ok" and continues down the hallway.

Later that day, three officers were in the hallway in front of the plaintiff's cell distributing lunch trays to inmates. Body-camera footage indicates that these officers were Ault, Bonis, and Weycker. *See* DVD recordings entitled "Ault Lunch Trays," "Bonis Lunch Trays," and "Weycker Lunch Trays." The footage from all three cameras depicts the same events from different vantage points. In the video entitled "Ault Lunch Trays," Ault passes the plaintiff's cell and the plaintiff points to his window and says, "There's shit all over here." Ault responds, "Yeah, absolutely, Bonis is going to take care of you on that." According to declarations submitted by the other officers, the responsibility for providing cleaning supplies to inmates on the 200 wing was Bonis's, since he was the "wing officer." *See* Gomm Decl. ¶ 25; Weycker Decl. ¶ 11; Neveu Decl. ¶ 3. In the video entitled "Bonis Lunch Trays," Bonis tells an officer who appears to be Weycker, "he wants some cleaning supplies." Weycker responds, "that's fine," and Bonis states, "it's pretty nasty." In the video entitled "Weycker lunch trays," the plaintiff points out the dirty areas of his windows to Weycker, and after Bonis tells Weycker that the plaintiff wants some cleaning supplies, Weycker tells Bonis that getting the supplies "sounds like a 200-wing officer job" to him.

Another set of body-camera recordings depicts two officers distributing medications to inmates on the plaintiff's wing, including to the plaintiff. *See* DVD

8

recordings entitled "Bonis Med Pass" and "Neveu Med Pass." These videos were recorded on November 30, 2018 and show that, as Bonis is attempting to distribute medications to the plaintiff, the plaintiff points out the areas around the window that were contaminated with what the plaintiff believed to be feces. The plaintiff asks Bonis and Neveu for cleaning supplies and says that he will clean the widow himself. Bonis says that the plaintiff's request for cleaning supplies is "respectable" and "seems reasonable." Bonis then continues down the hall to finish distributing medications. Neveu continues talking with the plaintiff at his cell window, and the plaintiff asks Neveu to find some of his property that was not transferred from his old cell. Neveu agrees to look for the property and walks away.

In their declarations, Bonis and Neveu describe the events that are depicted in the mediation-pass videos. Each then states that he thought the other officer was going to get the cleaning supplies the plaintiff requested. Bonis states that, after he spoke with the plaintiff, his focus was on completing the medication pass, and that he thought that because Neveu continued speaking with the plaintiff after he left, Neveu would deal with the issue. Bonis Decl. ¶ 6. Neveu states that, because Bonis was the wing officer, he thought Bonis was going to provide the plaintiff with cleaning supplies. Neveu Decl. ¶¶ 4, 8.

In another set of videos taken on November 30, 2018, Officers Zitek and Whiting (who are not defendants) are seen distributing medications to inmates in the plaintiff's wing, including to the plaintiff. After the plaintiff tells the officers that he has feces on the door and window, Zitek tells the plaintiff that he will ask if he can remove the plaintiff from the cell and have the janitor "do a run" on the cell. Zitek and Whiting suggest that someone

9

might need to use a pressure washer or a tool to clean the area around the window. In his declaration, Zitek states that, after his conversation with the plaintiff, he told Sergeant Kyle Peotter (who is a defendant) about the condition of the cell, but Peotter told him not to provide the plaintiff with cleaning supplies. Zitek Decl. ¶ 5. Zitek does not recall the reason Peotter gave him for refusing to provide the supplies. *Id.* ¶ 6. Peotter, in his own declaration, states that he does not remember anyone telling him that the plaintiff's cell was dirty or that he needed cleaning supplies. *Id.* ¶ 5. Peotter states that he does not even remember the plaintiff. *Id.* However, Peotter states that, if he denied a request for cleaning supplies, it likely would have been because either "time didn't allow" or "there was something else going on in the unit." *Id.* ¶ 7.

In a video entitled "Zitek Mail," Zitek is at the plaintiff's cell distributing mail. He tells the plaintiff that Peotter said "no" to removing the plaintiff from the cell that night so a janitor could scrub it down. The plaintiff then asks for some shampoo to use to clean the cell himself, and Zitek says he would see what he could do. Zitek also advises the plaintiff to ask "first shift" about having his cell cleaned. In his declaration, Zitek says that, the next day (December 1, 2018), the plaintiff again complained about the condition of his cell, and Zitek reported the issue to the sergeant on duty at the time, who authorized Zitek to have the cell cleaned. Zitek Decl. ¶ 7. Zitek states that he escorted an inmate janitor to the cell to clean it. *Id.* ¶ 8. Zitek states that he thought the material in the window was dried food rather than feces. *Id.* After December 1, the plaintiff did not again complain to Zitek about the condition of his cell. *Id.* ¶ 9.

The plaintiff does not dispute that Zitek had his cell cleaned on December 1. He does contend that "[n]one of the defendants" ensured that his cell was cleaned, *see*

10

Lindell Decl. ¶ 38, but because Zitek is not a defendant, this statement does not contradict Zitek's claim that he had an inmate worker clean the cell. Further, in his inmate complaint on this issue, the plaintiff reported that, on December 1, 2018, he received shampoo and rags to clean the door, and that a "swamper" partially cleaned the door two days later. ECF No. 115-12 at 11. Still, the plaintiff states that his cell door and window remained soiled until he was transferred out of the unit on February 25, 2019. Pl. PFOF ¶ 70. Thus, construing the facts in the light most favorable to the plaintiff, I will assume that the inmate worker did not successfully remove all the material from the door and window during his cleaning.

The record contains no evidence suggesting that, after December 1, Lindell complained about the condition of his cell to any defendant other than Van Lanen. As for Van Lanen, he visited the plaintiff at his cell on December 8, 2018 with his body camera activated. The video entitled "Van Lanen—Furlow Removal from 234" shows that, when Van Lanen arrives at the cell and asks the plaintiff how he is doing, the plaintiff says, "Not very good. I have shit in my window." Van Lanen responds by stating he could neither confirm nor deny that Lindell put it there. The plaintiff then changes the topic and asks Van Lanen about a vegan diet he requested. Once their discussion about the vegan diet ends, Van Lanen walks away.

On December 12, 2018, the plaintiff filed an inmate complaint about the condition of his cell. ECF No. 115-12 at 11. He alleged that Van Lanen had him transferred to cell 220 because he was filing inmate complaints for Travant Schmidt. He also alleged that feces was smeared on the window and door of the cell and described his attempts to have it cleaned. The plaintiff acknowledged that, after being in the cell for a day, he was

11

given shampoo and rags to use to clean the cell and that two days later an inmate worker tried to clean the cell but did not entirely remove the feces from his window. The plaintiff asked to have his cell properly cleaned with a power washer and bleach. He also requested damages for having to live in the contaminated cell. The inmate complaint examiner who reviewed the plaintiff's complaint determined that the cell was cleaned but that the inmate worker "missed the dried food particles in the window area." *Id.* at 8. The examiner found that "[t]he issue was rectified on 12/1/18" and dismissed the complaint. *Id.* The plaintiff filed unsuccessful administrative appeals.

In this suit, the plaintiff alleges that Van Lanen assigned him to a feces-smeared cell to retaliate against him for assisting inmate Travant Schmidt, which the plaintiff believes is conduct protected by the First Amendment. He also alleges that Van Lanen, Gomm, Weycker, Peotter, Ault, Neveu, and Bonis were deliberately indifferent to the conditions of his cell, in violation of the Eighth Amendment.

## C.    Claims Against Supervisors

The plaintiff also brings claims against three defendants who were not personally involved in the above events but who allegedly turned a blind eye to abusive behavior by Van Lanen, Gomm, and Weycker. Am. Compl. ¶ 29. These defendants are William Pollard, the Warden of Green Bay Correctional Institution; Steve Schueler, the institution's deputy warden; and John Kind, the institution's security director. The plaintiff contends that these defendants received numerous complaints from inmates about being assigned to filthy cells, and that they took no corrective action. Pl. PFOF ¶¶ 57–62, 66–69. He contends that the defendants' indifference to these complaints renders them liable, under the Eighth Amendment, for any constitutional violation that occurred due to his

confinement in a dirty cell. *See* Pl. Br. at 15–18. He also contends that the supervisory defendants are liable for any retaliation committed by Van Lanen. *Id.* at 14.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### A. Injunctive Relief and Qualified Immunity

Before addressing the merits of the plaintiff's claims, I pause to note that the plaintiff seeks both injunctive relief and damages, and that the defendants have asserted qualified immunity. The defense of qualified immunity applies to the plaintiff's damages claims, but not to his claims for injunctive relief. *See, e.g., Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012). However, it is clear that even if the plaintiff prevailed on the merits of his claims, he would not be entitled to an injunction. The alleged constitutional violations occurred in 2018, while the plaintiff was incarcerated at Green Bay Correctional Institution. The plaintiff has since been transferred to a different institution, and so an injunction aimed at Green Bay would not be warranted. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (transfer to new institution moots request for injunctive relief against old institution). Thus, the only possible relief the plaintiff could obtain in this case is damages. Qualified immunity is therefore a potentially dispositive

13

issue, and so I will begin by setting out the applicable legal standards for assessing that defense.

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). More than a "mere defense to liability," it provides "*immunity from suit*." *Mitchell v. Forsyth*, 472 U.S.511, 526 (1985). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The doctrine "is an affirmative defense." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). "[O]nce the defense is raised, it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam). These questions may be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019).

A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Weinmann v. McClone*, 787 F.3d 444, 450. "[T]he clearly established right must be

14

defined with specificity." *City of Escondido v. Emmons*, __ U.S. __, 139 S. Ct. 500, 503, (2019). This means courts "analyze whether precedent squarely governs the facts at issue, mindful that [courts] cannot define clearly established law at too high a level of generality." *Strand v. Minchuk*, 910 F.3d 909, 917 (7th Cir. 2018).

## B. Strip Search Claims

### 1. Exhaustion

The defendants first contend that the plaintiff did not exhaust his First Amendment retaliation claim relating to the strip search. The Prison Litigation Reform Act ("PLRA") provides that an inmate cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies). Exhaustion requires that an inmate comply with the rules applicable to the grievance process at the inmate's institution. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

The Inmate Complaint Review System ("ICRS") within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). Before an inmate may commence a civil action, the inmate must exhaust all administrative remedies that the Department of Corrections has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise issues regarding policies, living conditions, or employee actions that personally affect the inmate or institution environment." Wis. Admin. Code § DOC 310.06(1). To exhaust administrative remedies in Wisconsin, the inmate must file a complaint with the institution complaint examiner within fourteen

15

calendar days of the incident. Wis. Admin. Code § DOC 310.07(2). Each complaint may contain only one clearly identified issue, and it must contain sufficient information for the department to investigate and decide the complaint. Wis. Admin. Code § DOC 310.07(5), (6). An inmate may appeal the decision on the inmate complaint within fourteen days after the date of the decision. Wis. Admin. Code § DOC 310.09(1).

As discussed in the background section, the plaintiff filed an inmate complaint, GBCI-2018-25475, related to his strip search allegations. ECF No. 115-5 at 11. He complained that the strip search was unnecessary and that it was performed in a sexually degrading manner. However, the plaintiff did not suggest that the strip search was performed as retaliation for his having engaged in protected activity. Thus, although this complaint exhausted the plaintiff's claim involving the necessity and manner of the strip search, it did not exhaust the First Amendment retaliation claim.

The plaintiff contends that he is not required to make legal arguments in inmate complaints and that prison officials must draw reasonable inferences from inmate complaints. ECF No. 145 at 6-7. He states that the defendants knew why they did what they did, and he was only obligated to complain that they did it. Contrary to the plaintiff's assertions, for exhaustion purposes, the PLRA requires prisoners to provide a prison with "notice of, and an opportunity to correct, a problem." *Price v. Friedrich*, 816 F. App'x 8, 10 (7th Cir. 2020) (quoting *Schillinger v. Kiley*, 954 F.3d 990, 995-96 (7th Cir. 2020)); *see also Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013)); *Jones v. Bock*, 549 U.S. 199, 219 (2007). The plaintiff's inmate complaint does not identify the alleged protected conduct, i.e., that Van Lanen allegedly retaliated against the plaintiff because he, for example, filed complaints. The plaintiff's inmate complaint also does not allege that Van

16

Lanen ordered the strip search or that Gomm conducted the strip search in a harassing manner because of any First Amendment-protected activity. The plaintiff's failure to include this information deprived prison officials of the opportunity to address the acts of retaliation he now pursues in his lawsuit. Further, the plaintiff did not "clearly identif[y]" the issue, as required by Wis. Admin Code § DOC 310.07(5). *See Schillinger*, 954 F.3d at 995; *Price v. Friedrich*, 816 F. App'x at 10 (prisoner's retaliation claim not exhausted because grievances did not alert prison officials to prisoner's belief that legal materials were destroyed in retaliation for grievances prisoner filed).

Accordingly, the plaintiff's First Amendment retaliation claim relating to the strip search will be dismissed without prejudice for lack of exhaustion.

### 2. Merits

In discussing the merits of the plaintiff's remaining strip-search claims, I first note that the Seventh Circuit recently held that a convicted prisoner may challenge a "visual inspection" strip search (one that does not involve intrusion into a body cavity) under the Constitution's Fourth Amendment. *See Henry v. Hulett*, 969 F.3d 769, 779 (7th Cir. 2020) (en banc). In so holding, the court overruled its earlier precedents, which held that visual-inspection strip searches performed on convicted prisoners were subject to review under the Eighth Amendment only. *Id.* at 783 (overruling *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995) and *King v. McCarty*, 781 F.3d 889 (7th Cir. 2015)). The plaintiff filed his initial complaint and his amended complaint before *Henry* was decided, and he brought his non-retaliation strip-search claims under the Eighth Amendment only. *See* Compl. ¶ 32; Am. Compl. ¶ 32. Since *Henry* was decided, the plaintiff has not argued that his strip-search claims should be evaluated under the Fourth Amendment. Moreover, even if the

17

plaintiff had sought to bring a strip-search claim under the Fourth Amendment, the defendants would likely be entitled to qualified immunity, because at the time of the search the Seventh Circuit limited convicted prisoners to challenging visual-inspection strip searches under the Eighth Amendment, and thus the Fourth Amendment claim would not have been clearly established. In any event, for purposes of summary judgment, the outcome of the plaintiff's strip-search claims would be the same under either the Fourth Amendment or the Eighth Amendment. As explained below, the defendants are entitled to summary judgment on the plaintiff's claim involving the necessity of the search because they had reasonable suspicion that he might have possessed contraband. But both parties' motions for summary judgment must be denied as to the manner of conducting the search because there is a genuine factual dispute over whether Gomm performed the search in a degrading manner.

The Eighth Amendment safeguards prisoners against searches that correctional officers subjectively intend as a form of punishment. *Henry*, 969 F.3d at 781. A strip search of a prisoner violates the Eighth Amendment if its purpose is "maliciously motivated, unrelated to institutional security, and hence totally without penological justification." *Chatman v. Gossett*, 766 F. App'x 362, 364 (7th Cir. 2019) (quoting *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)). A strip search is penologically justified when it is reasonably related to finding contraband that threatens the safety and security of the prison. *Id.* (citing *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 695, 697 (7th Cir. 1998); *Del Raine v. Williford*, 32 F.3d 1024, 1029, 1041 (7th Cir. 1994)).

The Eighth Amendment focuses on the defendants' subjective state of mind. *Henry*, 969 F.3d at 781. But the Fourth Amendment focuses on objective reasonableness,

18

and thus "a defendant's subjective state of mind is irrelevant to a court's Fourth Amendment analysis." *Id.* "The Fourth Amendment thus protects prisoners from searches that may be related to or serve some institutional objective, but where guards nevertheless perform the searches in an unreasonable manner, in an unreasonable place, or for an unreasonable purpose." *Id.* When evaluating a prisoner's claim involving a strip search under the Fourth Amendment, a court "must assess that search for its reasonableness, considering 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Id.* at 779 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

I begin by assessing whether Van Lanen's decision to order the strip search was objectively reasonable. The Seventh Circuit has held that a strip search of an inmate is reasonable under the Fourth Amendment when correctional officers have reasonable suspicion that the inmate possesses contraband. *Brown v. Polk Cnty., Wis.*, 965 F.3d 534, 538–40 (7th Cir. 2020). Here, the record shows that Van Lanen had reasonable suspicion that the plaintiff possessed contraband. After other officers searched the plaintiff's cell, they reported to Van Lanen that screws were missing from the plaintiff's cell and that his cell contained hoarded food, broken containers, pen inserts, and excessive linens. Van Lanen Decl. ¶ 11.[3] In a prison setting, this report was sufficient to

---

[3] The plaintiff contends that Van Lanen's testimony about what other officers reported to him is hearsay. It is true that such testimony would be hearsay if offered for the truth of the matter asserted, which is that screws were missing from the plaintiff's cell and that contraband was found. *See* Fed. R. Evid. 801(c)(2). But the statements of the officers who searched the plaintiff's cell are not being offered for their truth. Instead, they are offered to show that Van Lanen was informed of these matters, which is relevant to whether he had reasonable suspicion to believe the plaintiff possessed contraband. Even if the report from the other officers turned out to be false, the fact that Van Lanen received

19

give Van Lanen reasonable suspicion to order a strip search. At the very least, Van Lanen would have qualified immunity, for the plaintiff has not cited a case clearly establishing that an officer lacks reasonable suspicion to order a strip search of a convicted prisoner when the officer is informed by other officers that the prisoner possessed contraband and may be in possession of small items (such as screws) that could be hidden in a body cavity.

The plaintiff disputes that screws were missing from his cell and that items of contraband, such as hoarded food and broken containers, were found in his cell. But even if the report of the officers who searched the plaintiff's cell were false, it would not alter the fact that Van Lanen received the report, had no reason to believe it was false, and thus had reasonable suspicion to order the search. *See Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000) (explaining that existence of probable cause does not turn on actual truth of matters reported to officers). The plaintiff also contends that "the defendants' own records" state nothing about screws or contraband other than hoarded food and broken containers being found during the search. Resp. to Def. PFOF ¶ 5. But the record the plaintiff cites is not an inventory of what was found during the cell search; it is a document recording the reason for placing the plaintiff on a property and bag-food restriction. *See* Exhibit 1013. So this document indicates nothing more than that it was the discovery of hoarded food and broken containers that caused the plaintiff to be placed on these restrictions. It does not suggest that officers who searched his cell did not also

---

the report would be relevant to whether he had reasonable suspicion. *See Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019).

report that screws were missing from the cell and that plaintiff possessed other contraband.

Accordingly, Van Lanen is entitled to summary judgment on the question of whether he had an objectively reasonable basis to order the strip search. But under the Eighth Amendment, I must also consider Van Lanen's subjective motivations. Here, the plaintiff contends that Van Lanen's subjective intent in ordering the strip search was to punish him for writing about prison conditions and helping other inmates file complaints and write other documents, not to ensure that he did not possess contraband.[4] However, a reasonable jury could not conclude that Van Lanen had an improper motive. No evidence connects the plaintiff's advocacy for himself and other inmates to Van Lanen's decision to order the strip search. The plaintiff, by his own admission, constantly writes content for the internet and aids other inmates, so the mere fact that he engaged in these activities in the weeks before the strip search is not suspicious timing that gives rise to an inference of retaliation. Further, the plaintiff's testimony about overhearing Van Lanen tell the psychologist that they needed to get the plaintiff away from Inmate Schmidt does not create a material factual dispute. A desire to separate the plaintiff and Schmidt does not imply a desire to perform an unnecessary strip search. Thus, even if Lindell's testimony is true, it does not suggest that Van Lanen ordered the strip search as retaliation for assisting Schmidt. Accordingly, Van Lanen is entitled to summary judgment on the

---

[4] This part of the Eight Amendment claim resembles the First Amendment claim I dismissed for lack of exhaustion, and it is arguable that the plaintiff did not exhaust the claim under the Eighth Amendment, either. But because this part of the Eighth Amendment claim fails on the merits, I do not further explore this issue.

21

question of whether he ordered the strip search to punish the plaintiff rather than search for contraband.

The remaining issue is whether the way the strip search was performed violated the Fourth or Eighth Amendment. And here, the existence of a material factual dispute prevents entry of summary judgment for either party. According to the defendants, Ault's body-camera footage shows the entire search and reveals that it was not performed in a demeaning manner. But the plaintiff swears in his declaration that, after Ault turned off his camera, Gomm told the plaintiff that, to get his clothes back, he would first have to stick his finger in his anus, show it to him, put the same finger in his mouth, and then move it around. Lindell Decl. ¶ 19. The plaintiff further swears that Gomm was "smiling insultingly" and that he told the plaintiff, "You like a shitty mouth, don't you?" *Id.* At summary judgment, I must assume that the plaintiff's testimony based on personal knowledge is true, even if it is contradicted by the defendants' testimony. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). Further, if Gomm actually made the statements the plaintiff swears he made, then a reasonable jury could find that the search was "conducted in a harassing manner intended to humiliate and cause psychological pain," in violation of clearly established Eighth Amendment standards. *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009).[5] Thus, a trial is needed

_____

[5] In their reply brief, the defendants contend that the "unpleasantness" of having to comply with Gomm's commands does not support an Eighth Amendment claim because a search of the plaintiff's anus and mouth was part of a legitimate search for contraband. Reply Br. at 1–2. But, under the plaintiff's version of events, a reasonable jury could find that Gomm was harassing or trying to embarrass the plaintiff with his comments rather than completing a legitimate search for contraband. Indeed, it is impossible to identify a legitimate reason for Gomm to have ordered the plaintiff to touch his anus with a finger

to resolve the factual dispute over whether Gomm made the harassing comments. Because the record indicates that Ault, Weycker, and Van Lanen were present at the time of the search and did not intervene to stop Gomm from continuing to harass the plaintiff, they along with Gomm are the defendants who must proceed to trial on this claim. *See Sanchez v. City of Chicago*, 700 F.3d 919, 928 (7th Cir. 2012) (failure to intervene is a form of personal involvement for purposes of § 1983).

## C.    Dirty Cell

Turning to the plaintiff's claims involving the dirty cell, the defendants admit that the plaintiff exhausted a First Amendment retaliation claim against Van Lanen concerning the decision to transfer him to cell 220, and Eight Amendment claims against Van Lanen, Weycker, Peotter, Gomm, Bonis, Ault, and Neveu concerning the condition of the cell.[6]

### 1.    Claim for retaliation against Van Lanen

To establish a prima facie case of First Amendment retaliation, the plaintiff must establish that (1) he engaged in activity protected by the First Amendment, (2) he suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was a "at least a motivating factor" in the Defendants' decision

---

and then place that same finger in his mouth, or to have told the plaintiff that he likes a "shitty mouth."

[6] The plaintiff seems to claim that Weycker, Peotter, Gomm, Bonis, Ault, and Neveu participated in Van Lanen's allegedly retaliatory conduct. *See* Am. Compl. ¶ 33. However, the plaintiff's inmate complaint did not allege that any defendant other than Van Lanen acted with a retaliatory motive. Instead, it only complained that they did not provide the plaintiff with cleaning supplies or have the cell cleaned promptly. *See* ECF No. 115-12 at 11. Thus, the plaintiff did not exhaust retaliation claims against these defendants. In any event, no evidence in the record gives rise to a reasonable inference that these defendants acted with retaliatory motives, so even if the claims were exhausted, they would fail on the merits.

to take the retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). The plaintiff contends he engaged in activity protected by the First Amendment because he helped Inmate Schmidt file inmate complaints and psychological-services requests.[7] *See* Am. Compl. ¶ 8; Lindell Decl. ¶ 16. However, it is not clearly established that this activity is protected by the First Amendment. Although inmates have a qualified right to assistance from "jailhouse lawyers" as part of their right of access to the courts, *see Johnson v. Avery*, 393 U.S. 483 (1969), it is not clear that a jailhouse lawyer has a First Amendment right to act as a jailhouse lawyer. *See Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (holding that inmate does not "possess a special First Amendment right to provide legal assistance to fellow inmates"); *Beese v. Todd*, 35 F. App'x 241, 244 (7th Cir. 2002) (stating that argument that inmate has right to provide legal assistance to inmates "lacks a basis in law"); *Leiser v. Canziani*, No. 16-CV-860, 2019 WL 959681, at *10 (W.D. Wis. Feb. 27, 2019) (noting that there is "no clearly established right to act as a jailhouse lawyer"). *But see Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996) (stating that prisoner has a claim under § 1983 if he is transferred "for assisting others in exercising their right of access to the courts"); *Buise v. Hudkins*, 584 F.2d 223, 231 (7th Cir. 1978) (holding that jailhouse lawyer "may have First Amendment associational rights in writ writing"); *Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015) (indicating that helping another inmate access the courts may satisfy the first element of a retaliation claim). Thus,

---

[7] The plaintiff also alleges that he engaged in protected activity when he filed his own complaints and published his own articles about prison conditions. However, in his inmate complaint, the plaintiff did not mention this activity; instead, he alleged that Van Lanen had him transferred to cell 220 "because [he] was filing ICs for T. Schmidt." ECF No. 115-12 at 11. Thus, the plaintiff did not exhaust a retaliation claim based on activity other than aiding Schmidt.

24

Van Lanen would likely have qualified immunity from suit based on a claim that his transferring the plaintiff for assisting Schmidt violated the First Amendment.

In any event, even if the plaintiff had a clearly established First Amendment right to assist other inmates, Van Lanen would be entitled to summary judgment. First, I note that the plaintiff does not contend that Van Lanen's transferring him to a *clean* cell was prohibited retaliation. Indeed, a transfer to a clean cell could not have violated the First Amendment because it was not the kind of deprivation that would likely deter First Amendment activity in the future. *See Douglas v. Reeves*, 964 F.3d 643, 647 (7th Cir. 2020) (holding that "a move from one cell to another, which can happen for many reasons outside the control of the prisoner," is not likely to deter First Amendment activity). Thus, Van Lanen could be liable for retaliating only if he knew that cell 220 was filthy. But no evidence in the record gives rise to a reasonable inference that Van Lanen knew this when he made the decision to transfer the plaintiff to a new cell. Van Lanen states in his declaration that he asked a sergeant to transfer the plaintiff to a new cell and that cell 220 was chosen randomly. Van Lanen Decl. ¶ 13. He states he did not inspect the cell before the plaintiff was moved into it and that he had no reason to think it was dirty. *Id*. ¶ 15. The plaintiff presents no evidence from which the jury could reasonably conclude that Van Lanen's testimony is false, and the plaintiff's hunch that Van Lanen is lying is not sufficient to survive summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Accordingly, Van Lanen is entitled to summary judgment on the retaliation claim.

### 2. Conditions of Cell After Transfer

The plaintiff contends that Van Lanen, Weycker, Peotter, Gomm, Bonis, Ault, and Neveu violated the Eighth Amendment by failing to promptly clean the cell once the

25

plaintiff complained that his cell door and window were contaminated with feces. In cases involving the conditions of confinement in a prison, two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health and safety—and second, a subjective showing of a defendant's culpable state of mind. *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) and *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

As to the first element, I conclude that the plaintiff has not raised a genuine factual dispute about whether, as an objective matter, the conditions of his cell were sufficiently serious to deny him the minimal civilized measure of life's necessities. The body-camera footage of Officer Maher making repeated trips into the plaintiff's cell shows that its walls and other surfaces were clean. But the video does not show the condition of the cell's door. According to the plaintiff, the door was contaminated with feces, and images from various officers' body cameras shows a dried substance tucked into small areas around the perimeter of the door's window. The defendants contend that this substance was dried food, but for purposes of summary judgment, I accept the plaintiff's testimony that this substance smelled like feces and therefore was feces. Cases recognize that exposure to human waste may violate the Eighth Amendment. *See Taylor v. Riojas*, __ U.S. __, 141 S. Ct. 52 (2020); *Thomas v. Blackard*, 2 Fed. 4th 716, 720–21 (7th Cir. 2021); *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989). But "[t]here are degrees of filth, ranging from conditions that are simply unpleasant

26

to conditions that pose a grave health risk." *Taylor*, 141 S. Ct. at 56 (Alito, J., concurring). The conditions at issue in the cases finding Eighth Amendment violations based on the presence of human waste were much more severe than those at issue here. They generally involved exposure to significant amounts of human feces along with other inhumane conditions, such as lack of access to water, clogged sewage pipes, and exposure to frigid temperatures. *See Taylor*, __ U.S. at __, 141 S. Ct at 53–54 (inmate confined for four days in a cell covered floor to ceiling with feces, followed by two days in a frigid cell with a clogged drain overflowing with bodily waste, forcing the inmate to sleep naked on the floor in raw sewage); *Thomas*, 2 F.4th at 720-21 (inmate confined in cell with feces-covered walls, a lack of hot water, hundreds of dead flies in his bed, and a mattress covered in human waste); *Vinning-El*, 482 F.3d at 924 (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water, and walls smeared with blood and feces); *Isby v. Clark*, 100 F.3d 502, 505-06 (7th Cir. 1996) (prisoner held in segregation cell that allegedly was "filthy, with dried blood, feces, urine and food on the walls"); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (prisoner held in cell that allegedly was filthy and smelled of human waste, lacked adequate heating, contained dirty bedding, and had "rusted out" toilets, no toilet paper, and black worms in the drinking water); *Pelker*, 891 F.2d at 139–40 (prisoner held for three days in segregation cell allegedly smeared with human feces and having no running water). In the present case, the plaintiff's cell was not covered from floor-to-ceiling with feces; there was only a small

amount on the cell door, and his cell was otherwise clean and functional.[8] The plaintiff

was not required to come into contact with the feces in order to eat, sleep, or bathe. The

plaintiff's minimal exposure to human feces, while undoubtedly unpleasant, did not pose

a threat to his health or safety and was not so serious as to deprive him of basic human

dignity. At the very least, the defendants would have qualified immunity, for no case

clearly establishes that an inmate's confinement in a mostly clean and functional cell that

is contaminated with a small amount of dried feces satisfies the objective component of

an Eighth Amendment claim.

Moreover, the plaintiff was confined in the cell for only a day before staff at the

correctional institution provided the plaintiff with cleaning supplies and had a janitor

attempt to clean the cell. The plaintiff contends that some dried feces remained on the

window's perimeter even after he and the inmate janitor tried to clean it. But in a similar

case, the Seventh Circuit rejected a prisoner's Eighth Amendment claim where the inmate

showed that human feces contaminated an enclosed section of plexiglass on his cell door

and behind the window screen near the foot of his bed. *Cobian v. McLaughlin*, 804 F.

App'x 398, 399 (7th Cir. 2020). There, the inmate tried to clean the feces with cleaning

supplies and running water from his cell, but he could not eradicate remnants in the

encased area of the plexiglass and behind the window screen. *Id.* at 399–400. The

Seventh Circuit rejected the inmate's Eighth Amendment claim on the ground that "no

evidence suggest[ed] that this unwanted residue severely endangered [the plaintiff] or

---

[8] In one of the recordings from the body cameras, the plaintiff complains that the toilet in his cell is leaking. However, he does not claim in this lawsuit that the leak was a serious issue. Thus, I assume the leak involved clean water rather than raw sewage.

that the defendants knew of such a danger." *Id.* Similarly, in the present case, no evidence suggests that the dried feces that survived the plaintiff's and the janitor's cleaning attempts severely endangered the plaintiff or that the defendants knew of such a danger. Thus, even assuming that the condition of the plaintiff's cell was sufficiently serious to implicate the Eighth Amendment before staff provided him with cleaning supplies and had the janitor attempt to clean it, no defendant could be liable for failing to take action to remove the residue that remained after the cell was cleaned on December 1. So Van Lanen, who first learned of the condition of the plaintiff's cell on December 8, is entitled to summary judgment.

As I have said, the remaining defendants are entitled to qualified immunity on the question of whether the cell conditions were objectively deplorable even before the plaintiff received cleaning supplies and the janitor tried to clean the cell. They are entitled to summary judgment for this reason alone. But even if they were not, the plaintiff has not raised a genuine factual dispute over whether any defendant he talked to before December 1 had a culpable state of mind, *i.e.*, acted with deliberate indifference. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). Although the plaintiff brought the feces around his window to the attention of several of the defendants on November 30 and none of them took corrective action immediately, no evidence suggests that they callously disregarded a known risk to his health, safety, or dignity. Defendants Weycker, Gomm, Ault, Bonis, and Neveu were all engaged in other tasks—such as distributing meals and medications—when the plaintiff asked for cleaning supplies. Thus, it is reasonable to think that they forgot about the plaintiff's request or that, as Bonis and Neveu state, they assumed that another officer was handling the plaintiff's request. At

29

most, this suggests negligence, which does not violate the Eight Amendment. *See Farmer*, 511 U.S. at 835. No evidence suggests that these defendants intentionally ignored the plaintiffs' requests for cleaning supplies. As for Peotter, the evidence indicates that he refused Officer Zitek's request to bring the plaintiff cleaning supplies, Zitek Decl. ¶ 5–6, and Peotter does not remember why he refused Zitek's request, Peotter Decl. ¶ 5. But this alone does not give rise to a reasonable inference that Peotter acted with a culpable state of mind. There are many legitimate reasons for refusing to immediately provide an inmate with cleaning supplies, *see* Peotter Decl. ¶ 7; Zitek Decl. ¶ 6, including that Zitek could not confirm to Peotter that the substance in the plaintiff's cell was feces, Zitek Decl. ¶¶ 6, 8. Moreover, the plaintiff actually received cleaning supplies the next day. *Id.* ¶ 7. Because Peotter's actions led to only a short delay in cleaning the plaintiff's cell, a jury could not reasonably find that he acted with deliberately indifference. And even if it could, Peotter would have qualified immunity because no case clearly establishes that such a short delay in providing cleaning supplies amounts to deliberate indifference.

Accordingly, all defendants are entitled to summary judgment on the plaintiff's Eighth Amendment claim involving the condition of his cell.

## D.    Supervisory Liability

The plaintiff brings claims for supervisory liability against Pollard, Schueler, and Kind based on their allegedly turning a blind eye to prisoner complaints about retaliation and dirty cells. However, for the reasons explained above, the plaintiff has either failed to exhaust his retaliation claims, or those claims fail on the merits. Further, the plaintiff has not shown that the conditions of his cell resulted in Eight Amendment violations. Because

the plaintiff cannot establish that violations of his rights occurred, the defendants cannot be liable for failing to prevent any such violations.

The only claims that survived summary judgment are the plaintiff's claims that Gomm performed the strip search in a humiliating manner and that Ault, Weycker, and Van Lanen failed to intervene to stop the humiliation. The plaintiff did not bring a claim for supervisory liability based on this conduct, and in any event, no evidence in the record supports a claim that Pollard, Schueler, and/or Kind knew about this conduct and turned a blind eye to it. Accordingly, the supervisory defendants are entitled to summary judgment.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 101) is **GRANTED PART** and **DENIED IN PART**. The motion is granted to the extent that (1) the plaintiffs' claims for injunctive relief are dismissed as moot, (2) his retaliation claims based on the strip search and any retaliation claims against defendants other than Van Lanen relating to the dirty cell are dismissed without prejudice for lack of exhaustion,(3) Van Lanen is entitled to summary judgment on the plaintiff's claim that he ordered the strip search unnecessarily or for an improper purpose; (4) Van Lanen is entitled to summary judgment on the plaintiff's claim that he retaliated against the plaintiff by assigning him to a dirty cell; and (5) all defendants are entitled to summary judgment on the plaintiffs' Eighth Amendment claim involving the conditions of his cell. The motion is denied as to the plaintiff's claims that Gomm performed the strip search in a humiliating manner and Ault, Weycker, and Van Lanen failed to intervene to stop the humiliation.

31

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (ECF No. 144) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for the court to consider additional legal authority (ECF No. 180) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 3rd day of September, 2021.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge